UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| PAMELA KEPFORD,<br>Plaintiff,<br>vs.<br>DOUGLAS A. COLLINS, Secretary of Veterans Affairs,<br>Defendant. | 4:23-CV-04157-KES<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |

Plaintiff, Pamela Kepford, sued defendant, Secretary of Veterans Affairs, Douglas A. Collins, for various violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e). *See* Docket 1. Kepford alleges that the Veterans Affairs Health Care System (VA) engaged in religious discrimination after she requested an exemption from the VA's COVID-19 vaccination and testing protocols. *See id.* Kepford asserts claims for disparate treatment (Count I), hostile work environment (Count II), constructive discharge (Count III), and unlawful retaliation (Count IV). *Id.* ¶¶ 71-93. Collins now moves for summary judgment on all counts. Docket 26. Kepford opposes the motion. Docket 35. After reviewing the parties' arguments and the record, the court issues the following order.

**BACKGROUND**

When considering a motion for summary judgment, the court generally views the facts and the inferences drawn from such facts "in the light most

favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Here, where a fact is admitted or undisputed, the court cites only the source in which it is first presented. Viewing the record in the light most favorable to Kepford, the court recites the following factual background:

**I. Kepford's Employment at the VA**

Kepford, a registered nurse, began working for the VA in 2015. Docket 28 ¶ 1. In January of 2021, Kepford began a new position as an Off-Tour Nursing Coordinator (OTC) and Staffing Methodology Coordinator. *See id.* ¶ 2. As an OTC, Kepford's responsibilities were evenly divided between providing patient care and fulfilling administrative duties, such as managing the daily staffing. *Id.* ¶ 4. Kepford's first-level supervisor was the Associate Chief Nurse, Lesley Cook, and her second-level supervisor was the Associate Director for Patient Services, Susan Leitheiser. *See id.* ¶¶ 5, 7.

On October 4, 2021, the VA made COVID-19 vaccination mandatory for all employees, requiring compliance by November 8, 2021, *id.* ¶ 12, unless the employee was granted a medical or religious accommodation by November 22, 2021, Docket 34 ¶ 12. Kepford received the first COVID-19 vaccine and experienced an adverse reaction. Docket 28 ¶ 16. Collins asserts that Kepford requested a religious exemption to the second COVID-19 vaccination, the booster, and additional testing on March 18, 2022. *Id.* ¶¶ 13, 40, 45. Kepford disputes the date the exemption was requested, asserting that she submitted a

timely request in October or November of 2021 to Cook for a religious exemption to the mandate. Docket 34 ¶ 13. The Reasonable Accommodation Specialist at the VA, Katie McGuire, Docket 28 ¶ 8, explained that it "was the supervisor's responsibility" to submit the requested exemptions because employees did not have access to the LEAF system, Docket 36 ¶ 11 (quoting Docket 37-5 at 6). Kepford admits that Cook entered her exemption request into the LEAF portal on March 18, 2022, and alleges that Cook acknowledged receiving the request by the October deadline. Docket 34 ¶ 13. Cook admitted that Kepford timely filed her exemption request in October of 2021 and that she did not submit the exemption request until March 18, 2022. Docket 37-2 at 15; *see also* Docket 37-5 at 5 (admitting that Kepford's exemption request was "filed timely under VA policy" sometime in 2021).

On November 1, 2021, Cook emailed Kepford to address concerns about her time management and delegation skills and to communicate the requirements for overtime approval. Docket 28 ¶¶ 23-24; *see also* Docket 29-12 at 2. Cook explained that she felt the email was necessary because Kepford "was the only [n]urse . . . who consistently worked past the end of her shift and requested overtime." Docket 28 ¶ 24.

In December of 2021, the ICU Nurse Manager, Chris Oye, told Cook that other nurses had expressed discomfort with Kepford sharing her personal views on the COVID-19 vaccine. Docket 28 ¶ 17. In response to these concerns, on December 28, 2021, Cook issued a Letter of Expectations setting forth expectations that Kepford must communicate professionally, act respectfully,

and refrain from speaking negatively about VA's COVID-19 vaccination policy. *Id.* ¶¶ 17, 20; Docket 34 ¶ 20; Docket 29-11 (Letter of Expectations). That same day, Cook met with Kepford to discuss the Letter of Expectations and both parties signed the Letter. Docket 28 ¶ 22. Collins alleges that the Letter of Expectations was not a disciplinary action, *id.* ¶ 18, and asserts that such letters are routinely used to communicate expectations to VA employees, *id.* ¶ 19. But Kepford contends that the Letter of Expectations resulted in disciplinary action because it was referenced as a basis for specific charges in her May 24, 2022, admonishment. Docket 34 ¶ 18. And Kepford alleges that Leitheiser testified that Cook violated her duty as a supervisor because her investigation did not follow the VA's investigative procedures. Docket 36 ¶¶ 19-20.

On February 12, 2022, Kepford overslept, was 45 minutes late to work, and did not contact Cook to disclose her absence. Docket 28 ¶¶ 25-26; Docket 1 ¶ 27. Front-line staff reported Kepford's absence to Cook roughly 10 days later. *See* Docket 28 ¶ 27. Cook then contacted Human Resources Specialist Danielle Safar to assist in the investigation of Kepford's absence. *Id.* ¶¶ 9, 28. On March 8, 2022, Cook met with Kepford to discuss the allegation that Kepford was late to work and conducted staffing from her phone. *Id.* ¶ 30. Kepford admitted that she overslept and conducted staffing on her way to work, but stated she accounted for that time by taking one hour of administrative leave, although she could not remember which day this occurred. *See id.* ¶ 31.

On March 11, 2022, Kepford informed Cook that her absence on February 12, 2022, was not entered as administrative leave. *Id.* ¶ 32. Kepford stated that she notified Cook of her absence at the time of the incident, but Cook did not find a record of that in her email, text, or call logs. *Id.* ¶¶ 32-34. Then, on March 15, 2022, after consulting with Human Resources, Cook notified Kepford that her 45-minute absence would be considered an Absence Without Leave (AWOL). *Id.* ¶ 35. Once Kepford's absence was classified as AWOL, Safar allegedly gave Cook the option of issuing an admonishment to Kepford. *Id.* ¶ 36. Although Kepford acknowledges that an admonishment may be an option for "unexcused tardiness," she disputes that it is an "appropriate penalty." Docket 34 ¶ 37. Cook decided to move forward and issue the admonishment. Docket 27 at 5.

On April 7, 2022, Cook and Leitheiser met with Kepford to discuss issues related to communication. Docket 28 ¶ 41. At this meeting, Kepford inquired about the status of her vaccination exemption request, which Cook submitted on March 18th but received from Kepford months prior, because she had not received an update. *Id.* ¶¶ 41-42; Docket 36 ¶ 30. Kepford alleges that she told Cook and Leitheiser at the meeting that she would not take another vaccine. Docket 36 ¶ 31. Though Cook could recall Kepford's inquiry about the status of her exemption request, she was unsure of the date or meeting when it occurred. Docket 28 ¶ 44. Leitheiser "vaguely remember[ed]" the inquiry but did not act on it because that was Cook's responsibility as Kepford's first-line

supervisor. *Id.* ¶ 43; Docket 36 ¶ 34. Kepford agrees that it was Cook's responsibility to follow up with her. Docket 36 ¶¶ 34-35.

On April 29, 2022, Cook issued a proposed admonishment to Kepford containing three charges: (1) unauthorized absence, based on her AWOL status on February 12th; (2) failure to properly request leave, based on her failure to timely request leave or notify her supervisor of her absence; and (3) failure to follow expectations, based on conduct allegedly inconsistent with the Letter of Expectations. Docket 28 ¶¶ 46-47. On May 3, 2022, Kepford acknowledged receipt of the proposed admonishment. *Id.* ¶ 46. In response, Kepford communicated to Leitheiser, the decision-maker on whether to issue the admonishment, that she felt harassed by Cook. *Id.* ¶ 48; Docket 36 ¶ 74. Then, on May 24, 2022, Leitheiser issued the admonishment; Kepford acknowledged receipt and chose not to appeal. Docket 28 ¶¶ 49, 51; Docket 34 ¶ 49.

"On July 23, 2022, Kepford closed the 2 South Medical/Surgical area to patients due to staffing levels." Docket 28 ¶ 52. Kepford failed to notify Leitheiser of the closure. *Id.* ¶ 53. The VA's Diversion Policy required Kepford to notify Leitheiser "as the ADPCS/NE, or her designee when there is a diversion of patients due to staffing levels." *Id.* ¶ 52. Kepford informed Leitheiser that she notified Cook about the closure, but also admitted that she was advised at the April 7th meeting that she was supposed to notify the ADPCS/NE if there was ever a diversion of patients due to staffing levels. *Id.* ¶ 53; Docket 34 ¶ 53. But Kepford stated that she had notified Cook of the closure because she knew Leitheiser had been on vacation the previous day. Docket 36 ¶ 87. Kepford also

alleges that Cook herself did not understand the policy. *Id.*; *see also* Docket 37-2 at 23-24.

On August 2, 2022, Kepford conducted a Staff Methodology panel meeting. Docket 28 ¶ 54. At the meeting, panel members began questioning Kepford about the data she presented, specifically indicating that the data was incorrect. *Id.* Cook, who was also present at this meeting, "explained that if there was new data, the unit panel would need to meet to review and vote prior to a facility panel meeting[.]" *Id.* As a result, Cook stopped the meeting and prevented Kepford from obtaining a vote. Docket 36 ¶ 104. Leitheiser, who previously met with Kepford on July 13, 2022, to outline the directives for running the Staff Methodology meeting, told Kepford that the meeting needed to happen prior to August 5, 2022. Docket 28 ¶ 55. Due to Leitheiser's deadline, Kepford held the August 2nd meeting without the finalized data from the first-level meeting. Docket 36 ¶¶ 101-03. Cook later admitted that she did not understand the data well enough to know if it was inaccurate. *Id.* ¶¶ 97-98; *see also* Docket 37-2 at 27.

On August 4, 2022, Kepford took sick leave without submitting her absence to the timekeeping system. Docket 28 ¶ 57; Docket 34 ¶ 57. When Kepford previously took sick leave, another VA employee, Kelsey Barker, would enter Kepford's sick leave into the VA system. Docket 34 ¶ 57. Despite this practice, on August 16, 2022, Cook ordered Kepford to enter her leave by 4:00 p.m. that day, which Kepford did not. Docket 28 ¶¶ 57-58. The following day, Cook again requested that Kepford enter her sick leave by the end of her shift.

*Id.* ¶ 58. Kepford asserts that she attempted to record her absence in the system, and on August 18, 2022—after multiple alleged outreach attempts by Cook—Kepford told Cook that there was a maintenance issue with the timekeeping system. *Id.* ¶ 59.

On September 14, 2022, Cook issued a proposed reprimand to Kepford based on the alleged incidents beginning on July 23, 2022. *Id.* ¶ 60. These incidents included: (1) failure to comply with the Diversion Policy and presenting inaccurate data; (2) failure to properly request leave for Kepford's absences on August 4th and 30th; and (3) failure to follow instructions, because she did not enter leave when requested. *Id.*; *see also* Docket 29-29 (proposed reprimand). Kepford received the proposed reprimand on September 23, 2022, and sent her response to Leitheiser, the official decision-maker, on September 29, 2022. Docket 28 ¶ 61.

Then, on September 29, 2022, Cook issued a written counseling to Kepford concerning the number of sick days she used between May 3, 2022, and September 27, 2022. *Id.* ¶¶ 62-63. Kepford disclosed to Cook during the written counseling meeting that her increased sick leave, using the 200+ hours she was allotted, was because she was "not sleeping and she was stressed because she believed Lesley Cook was harassing [her]." Docket 36 ¶ 116; Docket 37-1 at 13 (Kepford testifying that she had difficulties falling asleep and felt that she was being harassed); *see also* Docket 37-2 at 33-34 (Cook admitting that Kepford's "pattern of leave usage" after she would receive

counseling or reprimands was "because of [Cook's] oversight as her supervisor").

On October 2, 2022, Kepford sent a letter to Human Resources Chief Brent Weidler alleging a hostile work environment and stating that she was "being forced to resign[.]" Docket 28 ¶ 75; Docket 29-42 (letter of resignation). In her letter of resignation, Kepford explained that she was harassed and "became personally involved with the ongoing and progressive hostile work environment" after her April 7th meeting with Cook and Leitheiser. Docket 29-42. Kepford officially resigned on October 3, 2022. Docket 28 ¶ 76. Leitheiser did not issue a formal reprimand concerning the September 14, 2022, proposed reprimand, *id.* ¶ 69, but stated that she would have supported and upheld the reprimand if Kepford had not resigned, Docket 36 ¶ 112; Docket 37-3 at 22.

Cook admitted to having negative views of Kepford, which Cook shared with Safar and Leitheiser. Docket 36 ¶¶ 80-81; *see also* Docket 37-2 at 18. Cook also admitted that in July of 2022, she searched for emails from Kepford to look for instances of when Kepford spoke unprofessionally to her. Docket 36 ¶ 78; Docket 37-2 at 18. Cook then forwarded "the worst ones" to Safar, Docket 37-2 at 18, and sought guidance from HR to determine if Kepford could be written up for her emails, *id.* at 17. Cook testified that she did not write Kepford up for her emails because it "was probably not rising to the level of disciplinary action." *Id.* Cook stated that Kepford was the only employee she supervised who she investigated for sending "unprofessional" emails. *Id.* at 19-

20. Cook explained that she had only formally admonished Kepford and one other nurse who arrived late to work multiple times without notifying her supervisor or properly requesting leave. Docket 36 ¶ 50. Cook also admitted that while there were other employees she supervised who could have been marked AWOL, she declined to mark them as AWOL. *Id.* ¶ 51; *see also* Docket 37-2 at 5 (estimating that she has done this "five times a year"). For example, a different nurse at the VA, Wendy, was once two hours late in August of 2022 and one hour late in September of 2022, but Cook did not mark Wendy as AWOL. Docket 36 ¶ 52; Docket 37-2 at 9. Cook later conceded that she understood why Kepford felt harassed by her actions. *See id.* at 19-20; *see also* Docket 37-3 at 19 (Leitheiser testifying that, in hindsight, she understood how it may appear that Cook was "fixated" on Kepford).

## II. VA's Employee Policies and COVID-19 Vaccination Policy

The VA's employee policies provide that an admonishment is an official letter of censure for a minor act of misconduct, which normally remains in an employee's file for two years. Docket 28 ¶¶ 70-71; Docket 34 ¶ 71. In comparison, a reprimand remains in an employee's file for three years. Docket 28 ¶ 72. Cook testified that if an employee at the VA receives two reprimands in a single calendar year, "the next progressive discipline for a third reprimand is suspension, and the next discipline is removal." Docket 36 ¶ 47; Docket 37-2 at 21; *see also* Docket 29-20 (providing table of penalties for certain offenses). Written counseling is not a disciplinary action, and instead is used by the VA as a notice. Docket 28 ¶ 73. A written counseling "may only be kept for use in

support of other personnel action for six months unless other related misconduct occurs." *Id.*

Following the VA's institution of its COVID-19 vaccination policy, approximately 10-20 of its employees left in 2021-2022. Docket 36 ¶ 44. Leitheiser agreed that some of the employees left because they felt retaliated against and "singled out based on their view with respect to the vaccine[.]" Docket 37-3 at 6. During this same period, on April 7, 2022, Senator Mike Rounds sent a letter to Denis McDonough, the then-acting Secretary of the Department of Veterans Affairs, in which he expressed deep concern "with the failure of leadership" at the Sioux Falls VA (SFVA). Docket 37-8 at 1. Senator Rounds stated that "the SFVA medical center is a hostile work environment, where employees are mistreated" and where the SFVA Director and those working under his direction have engaged in "prohibited personnel practices[.]" *Id.* Senator Rounds indicated that at least 46 employees had left, "with more than a dozen departures in just the last several months." *Id.* In response to this letter, the Veteran Integrated Service Network 23 (VISN 23) "was tasked with investigating the concerns raised by Senator Rounds[.]" Docket 36 ¶ 39. Leitheiser was involved in discussions with the VA leadership regarding Senator Rounds' letter and recalled that the VA's leadership was concerned about the perception that the SFVA was "a toxic workplace" and that whistleblowers were being retaliated against. *Id.* ¶¶ 40-41.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may satisfy this burden by presenting evidence that there is no genuine dispute of material fact or by showing that the nonmoving party has failed to present evidence supporting an element of its claim on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment "must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *Krenik*, 47 F.3d at 957. Summary judgment is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## DISCUSSION

### I. Disparate Treatment

Kepford alleges that the VA Medical Center subjected her to disparate treatment based on her religion in violation of Title VII. Docket 1 ¶¶ 71-76, 81. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's religion. 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment on her religious discrimination claim, Kepford must show "proof of direct evidence of discrimination, where the term 'direct' 'refers to the causal strength of the proof' proffered by the employee" or create a " 'requisite inference of unlawful discrimination through the *McDonnell Douglas* [framework.]' " *Martinez-Medina v. Rollins*, 144 F.4th 1091, 1096 (8th Cir. 2025) (citation omitted).

#### A. Direct Evidence

To present direct evidence of discrimination, Kepford must show a sufficient nexus between the alleged discriminatory conduct and the challenged action such that a reasonable factfinder could conclude that "an illegitimate criterion actually motivated the employer's decision." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (citation omitted). Direct evidence of discrimination establishes a direct causal link between a prohibited motive and the challenged employment action. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) (en banc). To be actionable under Title VII, the challenged action must affect an identifiable term, condition, or privilege of

employment, but Kepford need only show some harm with respect to that term or condition; Title VII does not require proving significant or material harm. *Muldrow v. City of St. Louis*, 601 U.S. 346, 356-58 (2024).

Kepford alleges that direct evidence of discrimination exists "because Leitheiser testified that Cook was 'fixated' on Kepford" and agreed that it was "possible that Cook was motivated by personal animus toward Kepford[.]" Docket 35 at 9. Kepford contends Cook and Leitheiser's testimony implies that discriminatory animus could have been the motivating factor that led to the disciplinary action against her. *Id.* at 9-10. Here, the court agrees with Collins that "speculation is not direct evidence of disparate treatment." Docket 38 at 2. Testimony suggesting only the possibility that the challenged action may have been motivated by personal or discriminatory animus does not constitute direct evidence because it does not clearly point to the presence of an unlawful motive. *Torgerson*, 643 F.3d at 1044. Thus, because Kepford has failed to present direct evidence of disparate treatment, the court turns to whether Kepford has established a prima facie case under the *McDonnell Douglas* burden shifting framework.

**B. Prima Facie Case**

Under *McDonnell Douglas*, Kepford must first establish a prima facie case of religious discrimination. *Shirrell*, 793 F.3d at 887. Kepford's burden to make a prima facie case is low. *See Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1068 (8th Cir. 2017). To establish a prima facie case of religious discrimination under Title VII, Kepford must prove that "(1) she is a member of a protected

class because of her religious beliefs, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1113 (8th Cir. 2024) (quoting *Shirrell*, 793 F.3d at 887). An adverse employment action need not be "significant, material, or serious"; rather, Kepford must show only "some harm" with respect to "an identifiable term or condition of employment." *Id.* at 1114 (citation omitted).

Here, as Kepford notes, Collins does not dispute the first two and the fourth elements of Kepford's prima facie case. *See* Docket 27 at 9-10; Docket 35 at 10. So, the primary issue before the court is whether a genuine dispute of material fact exists as to whether Kepford suffered an adverse employment action. Kepford argues that the Letter of Expectations; the May 23, 2022, admonishment; the September 14, 2022, proposed reprimand; and the September 29, 2022, written counseling all constitute adverse employment actions. Docket 35 at 12-13.

Conversely, Collins argues that none of Kepford's challenged actions caused "harm to an identifiable term or condition of employment[,]" Docket 38 at 3, because "Kepford's position did not change, her pay was not reduced, and she did not lose any benefits[,]" Docket 27 at 9. Collins also states that because the proposed reprimand never became final and the written counseling was non-disciplinary, neither action affected Kepford's employment. *Id.* at 9-10. The court must therefore determine whether the evidence, viewed in the light most favorable to Kepford, creates a genuine dispute of material fact as to whether

the challenged actions caused "some harm" to an identifiable term or condition of Kepford's employment.

Viewing the evidence in the light most favorable to Kepford, a reasonable jury could conclude that the challenged documentation was not merely a series of isolated employment records. Although the Letter of Expectations was not itself formal discipline, Cook later relied on it to support Charge 3, "Failure to follow expectations," in the May 23, 2022, admonishment. Docket 29-27 at 1. The record also reflects that the VA employed a progressive disciplinary system under which multiple reprimands or admonishments could result in suspension and removal from service. *See* Docket 29-20; Docket 35 at 12-13. And Kepford alleges that each incident caused harm by subjecting her to progressively more severe disciplinary action and placing her at greater risk of future discipline. *See* Docket 35 at 12-13. From this evidence, a reasonable jury could infer that the challenged documentation functioned as a part of Kepford's progressive disciplinary process rather than a series of isolated personnel records, thus increasing Kepford's exposure to more severe discipline. And contrary to Collins's argument, Kepford need not show a change in her position, reduction in her pay, or loss of benefits. *See Muldrow*, 601 U.S. at 359. Instead, Kepford need only produce evidence from which a reasonable jury could conclude that the VA's actions caused "some harm" to "an identifiable term or condition of employment." *Id.* at 354-55; *Cole*, 105 F.4th at 1114. Because a reasonable jury could draw that inference from the record, a

genuine dispute of material fact exists as to whether Kepford suffered an adverse employment action.

Even if the VA had challenged the fourth element, the court agrees that Kepford has put forth sufficient evidence to create a genuine dispute of material fact as to whether the circumstances surrounding the challenged actions give rise to an inference of discrimination. Although Collins contends that the challenged actions were based on Kepford's conduct, Docket 27 at 10, the record contains sufficient evidence from which a reasonable jury could infer that the challenged actions were motivated, at least in part, by Kepford's religion. Kepford alleges that a different nurse whom she believed complied with the VA's COVID-19 vaccine mandate, Wendy, was late to work on two different occasions within two months without being "written up, marked AWOL, admonished, or disciplined for either instance." *See* Docket 35 at 14. Although Collins contends that Kepford does not know definitively whether Wendy was vaccinated, Docket 38 at 11, that uncertainty goes to the weight of the evidence, not its sufficiency to create a genuine dispute of material fact at the prima facie stage. Viewing the evidence most favorably to Kepford, she has presented sufficient evidence to establish a prima facie case of disparate treatment. So the burden now shifts to Collins.

**C. Collins's Legitimate, Nondiscriminatory Reason**

Because Kepford established a prima facie case of disparate treatment, "the burden shifts to [Collins] to articulate 'a legitimate, nondiscriminatory reason for [the]' " challenged employment actions. *Martinez-Medina*, 793 F.3d

at 1096 (citation omitted). "This burden is not onerous[.]" *Bone v. G4s Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012). Collins alleges that the proffered explanations for the Letter of Expectations, admonishment, proposed reprimand, and written counseling were legitimate: Kepford showed up 45-minutes late one time, failed to enter her sick time "in a timely fashion" more than once, violated the Diversion Policy, and did not conduct a unit staffing meeting "in the time frame requested by her superiors." Docket 27 at 10. Collins has met his burden of articulating nondiscriminatory explanations for the challenged actions, including Kepford's alleged attendance deficiencies and misconduct. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994-95 (8th Cir. 2011) (holding that performance deficiencies and policy violations constitute legitimate, nondiscriminatory reasons for alleged adverse employment action); *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1047 (8th Cir. 2003) (recognizing poor job performance as a legitimate, nondiscriminatory reason for alleged adverse employment action).

**D. Evidence of Pretext**

Because Collins has provided a legitimate, nondiscriminatory reason for Kepford's challenged actions, the burden shifts back to Kepford to establish that Collins's proffered reason is pretext for religious discrimination. *Martinez-Medina*, 793 F.3d at 1096. Kepford may establish pretext in two ways: "First, [Kepford] may rebut the factual basis underlying [Collins's] proffered explanation, [showing] the explanation is unworthy of credence. Second, [Kepford] may show that [Collins's] proffered explanation was not the true

reason for the action, but rather that the impermissible motive more likely motivated the employer's action." *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (internal citations omitted). To survive summary judgment, Kepford must present evidence from which a reasonable jury could conclude that Collins's proffered reasons were a pretext for religious discrimination. *See Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021).

Kepford argues Collins's record is unworthy of credence because it is undermined by several inconsistencies in the record and incomplete accounts of the events surrounding the challenged actions. *See* Docket 35 at 16; *see Fiero*, 759 F.3d at 878 (recognizing that a plaintiff may establish pretext by rebutting the factual basis underlying the employer's proffered explanation). Specifically, Kepford points to evidence of Cook's admitted negative personal views of her, conflicting accounts by Cook and HR regarding the investigation of Kepford's late arrival that led to her admonishment, inconsistencies between Cook's contemporaneous statements and her deposition testimony regarding Kepford's communication during that investigation, Cook's admission that Kepford should not have been disciplined for violating the Diversion Policy, and Leitheiser's acknowledgement that Kepford closing the unit on July 23, 2022, likewise did not warrant discipline. Docket 35 at 16-17. Viewing this evidence in the light most favorable to Kepford, a reasonable jury could conclude that Collins's stated reasons are unworthy of credence. *See Fiero*, 759 F.3d at 878.

A jury also may infer that Kepford's challenged actions took place shortly after conversations regarding her religious exemption request. In late 2021,

Kepford requested a religious exemption from COVID-19-related mandates, Docket 34 ¶ 13, and by the end of December she was issued the first of the challenged actions, the Letter of Expectations, Docket 28 ¶¶ 17, 20. Then, on April 7, 2022, Kepford followed up on the status of her request and informed Cook and Leitheiser that she refused to receive another vaccine. *Id.* ¶¶ 41-42; Docket 36 ¶ 30. According to Kepford, neither supervisor provided her an update regarding the request, despite the expectation that it be addressed in a timely manner. Docket 35 at 3-4; Docket 36 ¶¶ 33-36. Instead, a few weeks later, Kepford was issued a proposed admonishment. Docket 28 ¶¶ 46-47. Although temporal proximity alone is not generally sufficient to establish pretext, it may be considered together with other evidence tending to show that an employer's stated reasons are pretextual. *See, Wierman*, 638 F.3d at 994-95. While Collins contends that "Kepford has offered nothing other than her opinion that others were treated more favorably[,]" the court disagrees. Docket 38 at 5. Viewing the record in the light most favorable to Kepford, the court concludes that a reasonable jury could find that Collins's proffered reasons were unworthy of credence and instead were a pretext for religious discrimination. Thus, Collins is not entitled to summary judgment on Kepford's disparate treatment claim.

## II. Hostile Work Environment

Kepford asserts that VA subjected her to a hostile work environment due to her religion, in violation of Title VII. Docket 1 ¶¶ 71-76. To prevail on a claim of hostile work environment under Title VII, Kepford must show that "(1) she is

a member of the class of people protected by [Title VII], (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions, or privileges of her employment." *Martinez-Medina*, 144 F.4th at 1097 (alteration in original) (citation omitted). To determine whether harassment affected a term, condition, or privilege of employment, a court must "consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [the employee's] job performance." *Sellers v. Deere & Co.*, 791 F.3d 938, 945 (8th Cir. 2015) (citation omitted). To satisfy the fourth element, the harassment must "be severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must subjectively believe her working conditions have been altered." *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922 (8th Cir. 2018) (internal quotation marks omitted) (citation omitted).

Here, Collins does not dispute that Kepford is a member of a protected class under Title VII, nor does he challenge that Kepford's alleged harassment was due to her being a member of a protected class. *See* Docket 27 at 12-13. So, the court must first determine whether there is a genuine dispute of material fact that Kepford experienced unwelcome harassment and then consider the severity of the harassment and whether it was severe enough to affect terms or conditions of her employment.

Collins argues that Kepford "does not meet" her burden on the second element because the standard is "demanding," and Kepford did not suggest that the "[alleged] harassment was unwelcome." Docket 27 at 12-13 (citation omitted). Collins further alleges that Kepford's harassment claims fail to meet the fourth element because it lacked specific examples showing how the VA's "extreme behavior," *id.* at 13, "affected any term of her employment[,]" Docket 38 at 6. Conversely, Kepford argues that there is record evidence from which a reasonable jury could find she experienced unwanted harassment and that she subjectively believed that the VA's objectively abusive work environment and hostile actions affected the terms and conditions of her employment. Docket 35 at 20-23.

Kepford has presented sufficient evidence from which a reasonable jury could conclude that she subjectively believed the alleged harassment affected her working environment and the terms and conditions of her employment: Kepford alleges she sought a religious exemption and asked for an update on its status, Docket 35 at 23-24, communicated to Leitheiser, which Leitheiser admitted in her deposition, that Cook was harassing her, *id.*; Docket 37-3 at 16, and contested the proposed admonishment and maintained they were unfairly investigated, Docket 35 at 24. Kepford also contends that when Cook issued her written counseling, she told Cook her absences and sick leave were "because she could not sleep and she was stressed by Cook's harassment." *Id.* at 25-26. Under the totality of the circumstances, the frequency of the disciplinary actions taken against Kepford and the apparent negative effects

such actions had on Kepford's state of mind indicates that a genuine dispute of material fact exists as to whether the alleged harassment affected a term, condition, or privilege of her employment. *See Sellers*, 791 F.3d at 945.

There is also sufficient, objective evidence that establishes that a genuine dispute of material fact exists about whether Kepford's work environment was hostile. Kepford alleges that: (1) Leitheiser admitted and agreed that in 2021 and 2022 the Sioux Falls VA had a "bad" and "toxic" work environment, Docket 35 at 21, (2) Leitheiser testified that the VA lost between 10 and 20 employees during the relevant period because of their COVID-19 protocols, *id.,* (3) Senator Rounds, in a letter, expressed concern and acknowledged complaints he had received regarding the VA's hostile work environment, *id.; see also* Docket 37-8 at 1, (4) Cook engaged in improper investigation practices to form a basis to issue the Letter of Expectations, in which she was the only employee whose speech was restricted regarding COVID-19, and admonishment, *see* Docket 35 at 22-23, 25, and (5) the admonishment process was delayed and unfair, *id.* at 25. Although Collins correctly points out that Senator Rounds's letter did not specifically address the department Kepford worked for, *see* Docket 38 at 5-6, the letter still provides some evidence from which a reasonable jury could infer that concerns regarding the VA's work environment extended beyond Kepford's individual allegations. Independently, Senator Rounds's letter is insufficient to establish that Kepford's work environment was hostile, but a reasonable jury may consider it as part of the totality of the circumstances. *Sellers*, 791 F.3d at 945.

Viewing the record in the light most favorable to Kepford, genuine disputes of material fact remain as to whether Kepford was subjected to unwelcome harassment because of her religion and whether that harassment was sufficiently severe or pervasive enough to affect the terms or conditions of her employment. Because a reasonable jury could find that Kepford has established each element of the hostile work environment claim, Collins's motion for summary judgment on this claim is denied.

## III. Constructive Discharge

Kepford contends that the VA's actions created working conditions so intolerable that she was forced to resign, constituting a constructive discharge. Docket 1 ¶¶ 87-93. To prevail on a claim for constructive discharge, Kepford must show that "(1) a reasonable person in her situation would find the working conditions intolerable, and (2) the employer intended to force her to quit." *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023) (citation omitted). An employee, however, must allow "her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment." *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014) (citation omitted). Regarding the first element, "[t]he intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings[.]" *Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000) (citations omitted). Because Kepford resigned, she can satisfy the intent requirement by showing "that [Collins] could have reasonably foreseen that

[Kepford] would quit as a result of [the VA's] actions." *Sanders v. Lee Cnty. Sch. Dist.*, 669 F.3d 888, 893 (8th Cir. 2012) (citation omitted).

Collins argues that Kepford has failed to present sufficient evidence from which a reasonable jury could conclude that her working conditions were objectively intolerable. Specifically, Collins contends that Kepford relies on testimony concerning another department, offers only vague allegations, and fails to identify "concrete examples" showing that a reasonable person would have felt compelled to resign. Docket 38 at 13. Regarding the second element, Collins argues that none of Kepford's allegations "shows that there was an intention for her to quit" and that Kepford failed to provide the VA a reasonable opportunity to remedy the alleged conditions before resigning. Docket 27 at 20. Viewing the record in the light most favorable to Kepford, however, the same evidence supporting her hostile work environment claim also creates a genuine dispute of material fact as to whether Kepford's working conditions were objectively intolerable and whether the VA intended for, or could have reasonably foreseen, her resignation.

In addition to the evidence analyzed under the hostile work environment claim, Kepford also argues that "[i]t should go without saying, but the VA does not want sleep-deprived nurses showing up to their shifts to take care of patients[,]" but when she took her 200+ allotted hours of sick time, she was subjected to written counseling. Docket 35 at 37. Kepford argues that if she could not use her "sick leave to take care of herself, she had no option but to resign." *Id.* Kepford thus contends that "a reasonable person can find that the

VA stacked the deck against [her], rendering her working conditions objectively intolerable. *Id.* Thus, a reasonable jury could conclude that, considering the totality of the circumstances—including the alleged targeted investigations, disciplinary actions, restrictions to Kepford's speech, failure to adjudicate her religious exemption request (inaction), Kepford's repeated complaints of harassment to supervisors, and resulting work-related stress—a reasonable person in Kepford's position would have found her working conditions so intolerable as to feel compelled to resign. *See Sanders*, 669 F.3d at 893 (holding that conditions may be deemed intolerable through inaction).

Construing the evidence in the light most favorable to Kepford, a reasonable jury could conclude that, with respect to the second element, the VA should have reasonably foreseen Kepford's resignation and that Kepford provided the VA with ample opportunity to remedy the underlying issue. Leitheiser was aware that Kepford believed Cook was harassing her and that more than a dozen employees had resigned during the relevant period because of the VA's COVID-19 protocols. Docket 35 at 36. From this evidence, a reasonable jury could infer that employees who voiced substantial concerns about the VA's COVID-19 protocols were at an increased risk of resigning. *Id.* at 38. And Kepford informed Leitheiser multiple months before her resignation that she felt harassed by Cook. *Id.*

Viewed in Kepford's favor, the months that elapsed between her complaints regarding Cook's conduct and the VA's COVID-19 policies and her resignation afforded the VA reasonable opportunity to address those concerns.

Yet the record contains evidence from which a reasonable jury could conclude that the employer failed to do so. It is disputed whether Leitheiser complied with company policy by investigating Kepford's harassment complaint against Cook, and Cook testified that she does not recall any investigation into Kepford's allegations. *Id.* at 4-5. The record also reflects that the employer failed to comply with its own policy requiring a response to Kepford's exemption request within 30 days. *Id.* at 22. Kepford never received a determination on that request, despite evidence that both Leitheiser and Cook knew Kepford was awaiting a decision and that the lack of one contributed to her growing frustration with the workplace. *See* Docket 36 ¶ 10.

On this record, a reasonable jury could find that the employer had both notice of Kepford's concerns and a meaningful opportunity to correct them but failed to take appropriate action. Therefore, it was reasonably foreseeable that Kepford, as many other employees frustrated with the VA's COVID-19 mandates before her, would resign. Accordingly, Kepford has presented sufficient evidence to satisfy the second element of her constructive discharge claim, and Collins is not entitled to summary judgment on that claim.

## IV. Unlawful Retaliation

Kepford alleges that she was subjected to unlawful retaliation under Title VII. Docket 1 ¶¶ 77-86. Title VII prohibits retaliation by an employer against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].” 42 U.S.C. § 2000e-3(a).

In the absence of direct evidence of retaliation, claims of retaliation under Title VII are examined under the *McDonnell Douglas* burden shifting framework. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007) (applying the *McDonnell Douglas* standard to retaliation claims under Title VII). As such, Kepford must first establish a prima facie case of retaliation. *Id.* To do so, Kepford must show that “(1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action.” *Thomas v. Corwin*, 483 F.3d 516, 532 (8th Cir. 2007). To satisfy the first element, Kepford must show that she “oppos[ed] an act of discrimination” or “participat[ed] in an investigation[.]” *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 664 (8th Cir. 2021) (quoting *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (providing the definition for Title VII claims). Upon establishing a prima facie case, the burden shifts to the employer to produce some legitimate, non-discriminatory reason for the action. *See Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 714 (8th Cir. 2000). If the employer satisfies this burden, the plaintiff must show the proffered reason for the adverse action is pretext for religious discrimination. *Id.*

To prove her retaliation claim under Title VII, Kepford asserts that she engaged in statutorily protected activity by submitting a religious exemption to the VA’s COVID-19-related mandates and appealing the proposed

admonishment, which she contends was initiated in retaliation for pursuing the exemption. Docket 35 at 29. Kepford argues that she opposed an act of discrimination by telling Cook and Leitheiser that she would not take another COVID-19 vaccine during their April 7, 2022, meeting. *Id.* Kepford further asserts that she suffered materially adverse employment actions in the form of "repeated" disciplinary actions and scrutiny that began after she received "a fully satisfactory performance review" the previous March and after the April 7th meeting when Kepford inquired about the status of her exemption request. *Id.* at 33-34.

Here, the court agrees with Collins that Kepford has failed to establish a retaliation claim under Title VII because Kepford failed to show that she engaged in statutorily protected conduct. Kepford does not allege that she participated in an investigation and does not sufficiently show that she opposed an act of discrimination made unlawful under Title VII. *See Lopez*, 989 F.3d at 664. It is not enough for Kepford to argue that she inquired about the status of her religious exemption request and stated that she would refuse to take another COVID-19 vaccine because those actions do not constitute opposition to an employment practice made unlawful by Title VII. *See id.* at 665; *see also EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1102 (8th Cir. 2018) ("[M]erely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation."); *EEOC v. Kroger Ltd. P'ship I*, 608 F. Supp. 3d 757, 790 (E.D. Ark. 2022) (finding that "simply refusing to comply with [a] conflicting employment requirement is not

[oppos]ing an unlawful practice" (cleaned up)). So, Kepford failed to show she was engaged in statutorily protected conduct. Because Kepford did not engage in statutorily protected conduct, she cannot establish a causal connection between a protected activity and the alleged adverse action. As such, Kepford's retaliation claim under Title VII cannot survive summary judgment. Thus, Collins is entitled to summary judgment on Kepford's retaliation claim under Title VII.

**CONCLUSION**

Because there are genuine disputes of material fact on Collins's disparate treatment, hostile work environment, and constructive discharge claims, summary judgment is denied as to those claims. Summary judgment is granted as to Collins's retaliation claim. Thus, it is

ORDERED that Collins' Motion for Summary Judgment (Docket 26) is granted in part and denied in part.

Dated August 24, 2026.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE